## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRT LEASECO, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>DGI-BNSF CORP., )<br><br>Defendant. ) | Civil Action No. 20-cv-_____ |

## COMPLAINT

Plaintiff, TRT LeaseCo, LLC ("TRT"), for its Complaint against Defendant, DGI-BNSF

Corp. ("DGI"), states as follows:

## STATEMENT OF THE CASE

1.       TRT rents a railyard in Texas to BNSF Railway Company ("BSNF").  BNSF pays

its rental income directly into a trust account (the "Trust Account") at Wells Fargo, N.A. ("Wells

Fargo").  After Wells Fargo has taken its fee and made payments on TRT's debt obligations, TRT

is entitled to the remaining balance in the Trust Account.  TRT has no other bank accounts, income,

or sources of funds.

2.       On April 13, 2018, DGI filed suit against TRT in the Southern District of New York

(the "DGI Lawsuit"), seeking the payment of Service Fees under a Management Services

Agreement between the parties dated July 14, 2016 (the "MSA").

3.       From April 2018 through April 2020, TRT's intermediate parent companies CMC

Acquisition LLC ("Acquisition") and Kingsway America Inc. ("Kingsway") advanced, with the

intent of being repaid, TRT's costs and attorneys' fees related to the DGI Lawsuit, in the total

amount of $1,295,382.43. In April 2020, Acquisition and Kingsway stopped advancing TRT's costs and attorneys' fees, and TRT is now $264,297.74 in arrears.

4.      DGI, the "Service Provider" under the MSA, is responsible for performing certain managerial services on TRT's behalf. Leo Schwartz and Larry Krauss are principals of DGI with a financial interest in any Service Fees paid under the MSA.

5.      On July 1, 2020, TRT sought to transfer $1,295,382.43 of its funds in the Trust Account to reimburse Acquisition and Kingsway for their advance payments of TRT's costs and attorneys' fees related to the DGI Lawsuit. Mr. Schwartz, acting on behalf of DGI, asked Wells Fargo not to disburse the funds, and Wells Fargo honored DGI's request. DGI's position seems to be that TRT is not entitled to use funds in the Trust Account to pay its own costs and attorneys' fees related to the DGI Lawsuit.

6.      DGI's actions threaten to cause TRT irreparable harm, as TRT has no alternative sources of funds and would not be able to continue defending itself in the DGI Lawsuit without access to the funds in the Trust Account.

7.      TRT seeks an order from this court declaring that TRT has the right to use funds in the Trust Account to pay all costs and attorneys' fees it has incurred and will incur related to the DGI Lawsuit, including by reimbursing Acquisition and Kingsway, and that TRT may properly subtract those costs and attorneys' fees before calculating or paying any Service Fees that TRT might owe to DGI under the MSA.

## **PARTIES**

8.      TRT is a Delaware limited liability company whose sole member is non-party Texas Rail Terminal, LLC ("Texas Rail"). Texas Rail is a Delaware limited liability company whose sole member is non-party CMC Industries, Inc. ("CMC Industries"), a Texas corporation with its principal place of business in Texas or Illinois.

9.      Defendant DGI is a Delaware corporation with its principal place of business in Florida or Ontario, Canada.

## JURISDICTION & VENUE

10.      This court has subject matter jurisdiction over this dispute because there is complete diversity between the parties under 28 U.S.C. § 1332, and the amount in dispute exceeds $75,000, exclusive of interest and costs.

11.      Subject matter is also proper under 28 U.S.C. § 2201 because a ripe dispute and controversy exists between the parties.

12.      Pursuant to Paragraph 6(j) of the MSA, the parties consented to litigation in the Southern District of New York and have waived any claim that this Court lacks jurisdiction or that venue is improper.  Accordingly, venue is proper under to 28 U.S.C. § 1391.

13.      Venue is also appropriate in this court because this suit arises out of and relates to a separate lawsuit currently pending in the U.S. District Court for the Southern District of New York under the caption *DGI-BNSF Corp. v. TRT LeaseCo, LLC*, Case No. 18-cv-03252.

## GENERAL ALLEGATIONS

A.      CRIC's Acquisition of TRT's Company Group and the Establishment of the Trust Account

14.      TRT is a member of a "Company Group" consisting of TRT, Texas Rail, and CMC Industries.

15.      TRT owns a railyard in Texas (the "Railyard") that it leases to BNSF on a triple-net lease through May 2034 (the "BNSF Lease").

16.      In or about March 2015, CRIC TRT Acquisition, LLC ("CRIC") purchased 100% of the stock in CMC Industries and thus acquired ownership of the Company Group.

17.      As part of CRIC's financing of its purchase of the Company Group, TRT executed a promissory note dated March 12, 2015 (the "Note") and several related documents, including a

3

Deed of Trust, an Escrow and Servicing Agreement with Wells Fargo (the "Escrow & Servicing Agreement") (Exhibit A), and an assignment of rent and leases.

18.　　Pursuant to these documents, BNSF pays its rent for the Railyard directly into the Trust Account.

19.　　The Escrow & Servicing Agreement permits Wells Fargo to retain payments under the BNSF Lease sufficient to cover upcoming payments under the Note, a monthly servicing fee, and certain other amounts due to Wells Fargo.

20.　　The remaining balance in the Trust Account is available for TRT to disburse at its discretion subject to the procedures specified in the Escrow & Servicing Agreement.

21.　　The Escrow & Servicing Agreement authorizes TRT to designate certain individuals to issue wire transfer instructions and to confirm and authorize wire transfer instructions as to Trust Account balance.

22.　　These designated individuals are set forth on Schedule V to the Escrow & Servicing Agreement.

23.　　When TRT and Wells Fargo first executed the Escrow & Servicing Agreement, Mr. Schwartz and Mr. Krauss were listed on Schedule V as the individuals entitled to issue and confirm wire transfer instructions on behalf of TRT.  (Exhibit B)

B.　　CRIC's Sale of an 81% Stake in the Company Group to CMC Acquisition

24.　　In early 2016, the Company Group anticipated more than $100 million in taxable income from the BNSF Lease through May 2034.

25.　　Because BNSF paid all rent directly to Wells Fargo to pay the Note and related expenses, however, the Company Group had no funds available to pay the taxes on this income.

26.　　In industry parlance, the Company Group had "phantom income" on which it would owe millions of dollars in "dry taxes."

4

27.     On May 17, 2016, CRIC executed a Stock Purchase Agreement (the "SPA") (Exhibit C) under which it sold 81% of the shares in CMC Industries to Acquisition for $1.5 million.

28.     In addition to the SPA, the transactional documents included the MSA (Exhibit D).

29.     Under the MSA, DGI is responsible for performing certain managerial services on TRT's behalf.

30.     Mr. Schwartz and Mr. Krauss are principals of DGI with a financial interest in any Service Fees that TRT must pay to DGI under the MSA.

31.     The amounts of those Service Fees are to be calculated by applying a service-specific multiplier to the TRT Company Group's "Net Excess Cash."

32.     The MSA lists various amounts that are to be subtracted from this "Net Excess Cash" before calculating DGI's Service Fees, including a "Contribution and Liability Satisfaction Amount" (the "CLSA").

33.     The MSA defines the CLSA as:

> … the aggregate amount of any and all (1) capital contributions made to the Company or any of its subsidiaries by Kingsway Financial Services Inc. ("KFS") or any of its affiliates on or after the date of this Agreement and (2) debt, liabilities or other obligations (including in respect of taxes) of the Company or any of its subsidiaries (including any such debt, liabilities or other obligations owed to KFS or any of its affiliates) …

34.     The MSA contains a choice of law provision at Section 6(h) stating that:

> **Applicable Law**. This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any such claim, controversy or dispute), without giving effect to any choice or

conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

35.     The MSA contains a forum selection clause at Section 6(j) stating that:

**Consent to Jurisdiction**. THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK (COLLECTIVELY THE "DESIGNATED COURTS"). EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DESIGNATED COURTS. NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN ANY DESIGNATED COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE DESIGNATED COURTS HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE. EACH OF THE PARTIES ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH SECTION 6(a) OF THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN A DESIGNATED COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

36.     In early 2017, TRT and BNSF executed an amendment to the BNSF Lease (the "Lease Amendment"), which increased BSNF's monthly rental payments through 2034.

37.     Following the Lease Amendment, funds began to accumulate in the Trust Account.

38.     In February 2018, TRT and Wells Fargo signed an amended Schedule V adding Hassan Baqar as a person authorized to give wire transfer instructions, adding Mr. Baqar and John

Fitzgerald as people authorized to confirm wire transfer instructions, and removing Mr. Krauss

and Mr. Schwartz as people authorized to confirm wire transfer instructions.  (Exhibit B)

39.     In March 2019, TRT and Wells Fargo amended Schedule V by replacing Mr. Baqar

with Samuel Duprey as a person authorized to give and confirm wire transfer instructions.  (Exhibit

E)

40.     In May 2020, TRT and Wells Fargo amended Schedule V again by replacing Mr.

Duprey with Kent Hansen as a person authorized to give and confirm wire transfer instructions.

(Exhibit F)

C.     The DGI Lawsuit

41.     On April 13, 2018, DGI filed the DGI Lawsuit against TRT in the Southern District

of New York.

42.     In the DGI Lawsuit, DGI seeks the payment of Service Fees under the MSA.

43.     On April 17, 2018, the Southern District assigned the DGI Lawsuit to Judge Valerie

Caproni, who remains the assigned judge on this matter.

44.     During discovery, the parties engaged in extensive document discovery resulting in

their producing more than 5,700 non-privileged documents and privilege logs comprising more

than 240 pages, conducting eight depositions, and exchanging expert reports on tax accounting

and related issues.

45.     Discovery closed in the DGI Lawsuit on April 12, 2019.

46.     The DGI Lawsuit has been set for trial four times, first on October 21, 2019, then

on December 16, 2019, then on March 30, 2020, and now on November 16, 2020.

47.     Judge Caproni adjourned the October 21, 2019 trial date at DGI's request;

adjourned the December 16, 2019 trial date *sua sponte* due to DGI's motion for leave to amend its

complaint (filed after the July 15, 2018 deadline to amend), and adjourned the March 30, 2020 trial date at DGI's request.

48.    TRT has never requested an extension of the trial date in the DGI Lawsuit.

49.    Between April 2018 and April 2020, TRT incurred in excess of $1,295,382.43 in costs and attorneys' fees related to the DGI Lawsuit.

50.    Acquisition and Kingsway advanced TRT's defense costs through April 2020, in the total amount of $1,295,382.43.

51.    As a result, TRT has incurred $1,295,382.43 in liability to Kingsway, an amount that falls within the MSA's definition of the CLSA and must be subtracted prior to calculating any Service Fees that TRT might owe DGI.

52.    Since February 2020, TRT has incurred additional costs and attorneys' fees related to the DGI Lawsuit, including the $264,297.74 that remains in arrears.

53.    Acquisition and Kingsway have advised TRT that they will not advance any further funds to cover TRT's defense costs.

54.    TRT will incur substantial additional costs and attorneys' fees in defending the DGI Lawsuit through trial.

55.    Aside from the Trust Account, TRT does not have any bank accounts or sources of funds with which to pay for the defense of the DGI Lawsuit.

D.    DGI Blocks TRT's Efforts to Obtain Money from the Trust Account to Pay Defense Costs

56.    The current balance in the Trust Account is in excess of $3,000,000.

57.    Under the Schedule V as amended, Mr. Hansen, Mr. Schwartz, and Mr. Krauss are authorized to issue wire transfer instructions, and Mr. Hansen and Mr. Fitzgerald are authorized to confirm wire transfer instructions.

58.     On July 1, 2020, TRT's counsel advised Alan Doty at Wells Fargo that Mr. Hansen intended to initiate a wire transfer on July 2, 2020, and that he had no objection to Wells Fargo's copying Mr. Schwartz and Mr. Krauss on any confirmation email.  (Exhibit G)

59.     Later on July 1, 2020, Mr. Schwartz, acting on DGI's behalf, advised Mr. Doty that he "did not authorize any wire of funds" and to "call my cell."  (Exhibit G)

60.     Later on July 1, 2020, DGI's counsel advised TRT's counsel that they wished to take the issue "directly to Judge Caproni" and that DGI "reserve[d] all rights to hold your client, your firm or Wells Fargo liable for an improper transfer."  (Exhibit G)

61.     Later on July 1, 2020, DGI's counsel sent DGI's counsel supporting documentation showing that the purpose of the transfer was to pay TRT's costs and attorney's fees related to the DGI Lawsuit and asking if DGI continued to object.  (Exhibit G)

62.     Later on July 1, 2020, DGI's counsel confirmed that they objected to the payment on the grounds that "these legal fees are being paid to Kingsway's counsel for positions taken directly adverse to TRT LeaseCo's interests."  (Exhibit G)

63.     Later on July 1, 2020, Mr. Doty stated that, in light of the "issues in play," Wells Fargo would not honor Mr. Hansen's wire transfer request, notwithstanding that Mr. Hansen is authorized to issue and confirm wire transfer instructions.  (Exhibit H)

64.     On July 1, 2020, TRT also received, for the first time, a copy of a letter that DGI's counsel had sent to Doty on October 30, 2018.  (Exhibit I)

65.     In the October 30, 2018 letter, DGI's counsel misleadingly implied that a then-recent agreement between Acquisition and CRIC dismissing and tolling specific claims required Wells Fargo to block TRT's access to the Trust Account in perpetuity.  (Exhibit I)

66.     DGI's misrepresentations in the October 30, 2018 letter, and DGI's reiteration of these misrepresentations in 2020, caused Wells Fargo not to follow TRT's wiring instructions on July 1, 2020.

## COUNT ONE
### (DECLARATORY JUDGMENT)

67.     TRT repeats and incorporates each of its prior allegations as if repeated in full herein.

68.     In view of the positions that DGI, TRT, and their representatives have taken, a ripe dispute and controversy exists concerning the use of the funds in the Trust Account.

69.     DGI's efforts to block TRT from using its funds in the Trust Account, including to defend itself in the DGI Lawsuit, threaten irreparable harm to TRT and its interests.

70.     Monetary damages will not be sufficient to compensate TRT because the consequences of a crippled defense in the DGI Lawsuit cannot be reversed by the mere payment of money.

71.     Declaratory judgment is therefore necessary and appropriate to resolve the dispute over TRT's entitlement to use funds in the Trust Account.

72.     Accordingly, TRT requests the Court to declare that TRT has the right, under all relevant contracts (including the Escrow & Servicing Agreement and the MSA), law, and equity, to use the funds in the Trust Account to pay all costs and attorneys' fees it has incurred and will incur related to DGI Lawsuit, including by reimbursing Acquisition and Kingsway for TRT's costs and attorneys' fees that they have advanced.

73.     TRT further requests the Court to declare that TRT has the right, under all relevant contracts (including the Escrow & Servicing Agreement and the MSA), law, and equity, to deduct

all costs and attorneys' fees it has incurred and will incur related to the DGI Lawsuit before calculating any Service Fees that TRT might owe DGI under the MSA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, TRT LeaseCo, LLC, prays for the following relief:

    A.    that judgment be entered in favor of TRT;

    B.    that the Court declare that:

        i.    TRT has the right, under all relevant contracts (including the Escrow & Servicing Agreement and the MSA), law, and equity, to use the funds in the Trust Account to pay all costs and attorneys' fees it has incurred and will incur related to the DGI Lawsuit, including by reimbursing Acquisition and Kingsway for TRT's costs and attorneys' fees that they have advanced; and

        ii.    TRT has the right, under all relevant contracts (including the Escrow & Servicing Agreement and the MSA), law, and equity, to deduct all costs and attorneys' fees it has incurred and will incur related to the DGI Lawsuit before calculating any Service Fees TRT owes DGI under the MSA;

    C.    that the Court award TRT its costs and attorneys' fees incurred in this action; and

    D.    that the Court award TRT any and all further and other relief to which it may be entitled at law or in equity, including preliminary and permanent injunctive relief.

Dated:  July 9, 2020                          Respectfully submitted,

                                             /s/ James M. Barton
                                             Edward F. Ruberry (*pro hac vice* motion to be filed)
                                             Alexander R. Hess (*pro hac vice* motion to be filed)
                                             James M. Barton
                                             RUBERRY, STALMACK & GARVEY LLC
                                             10 S. LaSalle St., Suite 1800
                                             Chicago, IL 60603
                                             Tel.: (312) 466-8050
                                             Fax: (312) 466-8055
                                             ed.ruberry@ruberry-law.com
                                             james.barton@ruberry-law.com

                                             *Attorneys for Plaintiff, TRT LeaseCo, LLC*